# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JENNIFER L. PATTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:12-cv-0129** |
| **v.** | ) | **Judge Nixon/Brown** |
| | ) | |
| **MICHAEL ASTRUE, COMMISSIONER** | ) | |
| **FOR SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

This action was brought under to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of the final decision of the Social Security Administration (SSA), through its Commissioner ("the Commissioner"), denying the plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(i), 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. § 1382, 1382c. For the reasons explained herein, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the record (DE 12) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

The plaintiff filed an application for DIB on April 17, 2009 and for SSI on April 22, 2009, alleging a disability onset date of May 20, 2007. (DE 10, pp. 125-34) The plaintiff claimed disability by reason of bipolar disorder, high blood pressure, and breathing problems. (DE 10, p. 148) The plaintiff's claims were denied on July 10, 2009 (DE 10, pp. 68-73), and her request for reconsideration was denied on October 16, 2009 (DE 10, pp. 80-85).

The plaintiff requested a hearing before an Administrative Law Judge (ALJ) on October 28, 2009. (DE 10, pp. 9, 86-92) The hearing was held before ALJ David A. Ettinger on December 14,

2010.[1]  (DE 10, pp. 22-47)  Attorney William Taylor represented the plaintiff at the hearing.  (DE 10, pp. 22, 123-24)

The ALJ denied the plaintiff's applications for benefits on January 7, 2011.  (DE 10, pp. 6-17)  On January 17, 2011, the plaintiff asked the Appeals Counsel to review the ALJ's decision.  (DE 10, p. 5)  The Appeals Council declined to review her case on November 30, 2011, whereupon the ALJ's decision became the final decision of the Commissioner.  (DE 10, pp. 1-3)

The plaintiff brought this action in district court on January 30, 2012 seeking judicial review of the Commissioner's decision.  (DE 1)  The defendant filed an answer and a copy of the administrative record on May 2, 2012.  (DE 9-10)  Thereafter, the plaintiff filed a motion for judgment on the administrative record on May 23, 2012 (DE 12), to which the defendant filed a response on July 23, 2012 (DE 15), and the plaintiff filed a reply on August 10, 2012 (DE 18).

This matter is properly before the court.

## II.  Review of the Record

### A.  Relevant Medical Evidence

The plaintiff was treated at St. Thomas Hospital ("St. Thomas") in Nashville from May 19, 2005 until April 14, 2009.  (DE 10, pp. 221-41)  The record shows that the plaintiff was treated at St. Thomas at least ten (10) times during this nearly four-year period, by a nearly equal number of medical professionals.  The  reasons for the plaintiff's visits to St. Thomas included diabetes screening, physical examinations, female matters, allergies, medication refills, birth control counseling, possible lead exposure, and weight loss counseling.  (DE 10, pp. 222-41)  The terms

---

[1]  The plaintiff previously was denied benefits on August 23, 2006 by ALJ Linda Roberts.  (DE 10, pp. 49-60)  "[W]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by th[at] determination absent changed circumstances." *Drummond v. Commissioner of Social Security*, 126 F.3d 837, 842 (6th Cir. 1997).  To establish entitlement to benefits in a subsequent claim, a comparison between circumstances existing at the time of the prior decision and circumstances at the time of the subsequent review is necessary.  *Kennedy v. Astru*, 247 Fed.Appx. 761, 768 (6th Cir. 2007).  The ALJ in this action determined that the plaintiff's "overall medical condition n has significantly changed."  (DE 10, p. 9)

"mental," "bipolar," and "fatigue" appear intermittently in the St. Thomas records, but without explanation or reference to clinical or diagnostic tests or techniques that might have led to those observations.[2] (DE 10, pp. 224, 228, 230, 232, 236, 238)

The plaintiff was treated for mental health reasons at the Centerstone Community Health Care Center ("Centerstone") from November 4, 2003 to February 13, 2009 when her case was "terminated." (DE 10, pp. 242-402) The record contains twenty-six (26) "progress" notes corresponding to that period of time, representing the assistance of at least eight (8) different health care professionals. (DE 10, pp. 270-396) The "Medical Progress Notes" reflect the following: no medical concerns; no memory or concentration testing performed; a diagnosis of bipolar I disorder in partial remission; a Global Assessment of Functioning (GAF) score of 70;[3,4] overall Clinically Related Group (CRG) assessment scores of 3, *i.e.*, "mild" mental functional limitations in four categories discussed in more detail *infra* at p. 4; no treatment or service plan; no psychological/mental testing; appointments averaging 20 minutes in length, and an apparent reliance on the plaintiff's subjective complaints. (DE 10, pp. 270-74, 276-85, 289-99, 304-23, 328-47; 349-53, 357-61, 366-70, 374-83, 391-95) The "Medical Progress Notes" also reflect the following observations throughout the period of treatment: continually improved feeling of wellness; stable mood; appropriate interpersonal relations; effectiveness of medications; job satisfaction; improved

---

[2] The record shows that plaintiff returned to St. Thomas numerous times between April 14, 2009 and July 8, 2009 (DE 10, pp. 415-20, and between October 23, 2009 October 14, 2010 (DE 10, pp. 501-09). However, there is nothing in these records that appears to go to the issues before the court.

[3] The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas. *See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994).

[4] The first mention of the plaintiff's GAF score is in the May 13, 2004 "Medical Progress Note" and appears to have been determined on March 5, 2004. (DE 10, p. 284) There is nothing in the record that shows how or under what circumstances that score was determined.

sleep, energy, appetite and concentration with only occasional fatigue; and generally normal mental exams. The "Narrative Progress Notes," "Nurse Progress Notes," and "Outpatient Treatment Notes" all are consistent with the "Medical Progress Notes." (DE 10, pp. 324-25, 354-55, 363-65, 384-85, 388-90)

The Centerstone records also contain eight (8) CRG assessments completed between March 5, 2004 and March 5, 2008. (DE 10, pp. 243-65) The CRG assessments addressed the plaintiff's mental health in the following four (4) areas: 1) daily living activities; 2) interpersonal functioning; 3) concentration, task performance, and pace; and 4) adaptability to change. (DE 10, pp. 243-65) With the single exception noted at n. 5 below,[5] the plaintiff was determined to have "mild" mental functional limitations in each of these four categories (DE 10, pp. 243-44, 246-47, 249-50, 252-53, 255-56, 257, 260-61, 263-64), and she was assigned an overall CRG assessment rating of 3, *i.e.*, "not recently severely impaired . . . but ha[s] been severely impaired in the past . . . and need[s] services to prevent relapse . . . ."[6] (DE 10, pp. 245, 248, 251, 254, 258-59, 262, 265) The CRG assessments also assigned the plaintiff GAF scores of 70. (DE 10, pp. 245, 248, 251, 254, 258-59, 262, 265)

Upon termination of the her case on February 13, 2009, Centerstone diagnosed the plaintiff with bipolar I disorder in partial remission, with "[o]ccupational problems," *i.e.*, she was unemployed, and problems with her primary support group. (DE 10, pp. 400-01) She also was discharged with a GAF score of 70. (DE 10, p. 401)

On May 19, 2009, three months after terminating her case, Centerstone completed another

---

[5] In the August 8, 2005 CRG assessment, it was recorded that the plaintiff had a "moderate" limitation in adaption to change. (DE 10, p. 247) Although the assessment refers to the "medical progress note dated 7/12/05," there is nothing apparent in this note to link it to the change in the August 8th CRG assessment. In the six (6) CRG assessments that followed, the plaintiff was rated "mild" in all four categories.

[6] The record shows that the CRG assessments indicate that they were completed only once with "adequate" information (DE 10, p. 262), the remainder having been completed with "minimal" information (DE 10, pp. 245, 248, 251, 254, 258-59, 265).

CRG assessment. (DE 10, pp. 450-52) In that assessment, Centerstone changed the plaintiff's functional assessment from "mild" to "moderate" in her daily life functions; from "mild" to "moderate" in her interpersonal functioning; from "mild" to "marked" in her ability to concentrate, perform tasks, and keep pace; and from "mild" to "moderate" in her ability to adapt to change.[7] (DE 10, pp. 450-51) Centerstone also changed the plaintiff's overall CRG assessment rating from a 3, "formerly severely impaired" to a rating of 1 – "persons with severe and persistent mental illness."[8] (DE 10, p. 452) The plaintiff's GAF score also was changed from 70 to 68. (DE 10, p. 452)

Leah Hawkins, M.A. and Bobbie L. Hand, M.S. (Hawkins and Hand) evaluated the plaintiff's mental condition on June 12, 2009 at the request of the SSA. (DE 10, pp. 403-08) Hawkins and Hand conducted a clinical interview of the plaintiff and administered the following tests: Mental Status Examination, Bender Gestalt Test, and the Rey 15-Item Memory Test. (DE 10, p. 405)

When asked during the interview why she applied for disability benefits, the plaintiff replied in relevant part: "I have a baby and I want to be home with him and I really need money to help pay

---

[7] The change from "mild" to "moderate" has the effect of changing the frequency of potential problems from "some or occasional" difficulty to "regular or frequent" difficulty, and from "mild" to "marked" from "some or occasional" difficulty in performing to "seldom able" to perform.

[8] Although CRG addressed above noted that it was based on "adequate" information (DE 10, p. 452), unlike the previous 8 CRG assessments, no reference is made in it to any "Medical Progress Note" as the basis for the assessment. Moreover, the "Outpatient Treatment Progress Note" dated May 19, 2009, the same day as the CRG assessment, is devoid of any specific clinical observations. Apart from the plaintiff's personal information, the only entry on the form is the following statement:

> Patient was alert and fully oriented. Mood reported [*sic*] ok [*sic*], affect appropriate. Thought processes were logical and linear. No delusional, paranoid or otherwise unusual thought content noted. She denied any current perceptual distortions. She denied any suicidal and/or homicidal ideation. No substance abuse reported. Patient reported having a young child at home, keeping her very busy. She described herself as a [*sic*] busy, tired lady. [*sic*] She stated that she needed to get on a safety net in order to be able to continue her medication. Insight seemed rather poor, motivation for treatment good.

(DE 10, p. 455)

the bills." (DE 10, p. 403)  The plaintiff also told Hawkins and Hand that she was "a lot better because . . . [her] medication helps."  (DE 10, p. 403)  When asked about her daily routine, the plaintiff replied as follows :

> In the morning, she said, 'I fix breakfast, vacuum, fold clothes, and take care of my baby.' She prepares lunch, saying that a typical meal might consist of grilled chicken or pizza. She watches television and puts her child down for a nap in the afternoon. She prepares supper. After supper, she said, 'I spend time with my husband, put the baby to bed, and clean.' Mrs. Patton said that she goes to bed between 11:00 p.m. and 1:00 a.m., adding that she sleeps well 'throughout the night.' Mrs. Patton said that her current hobbies include 'church, writing stories, being with my baby, watching television, exercising, walking, and talking to friends.' Mrs. Patton said that she misses working, and when asked why she does not work, she responded, 'My health and I have a baby to take care of.' Mrs. Patton stated that she is able to attend to all of her self-care needs unassisted. She said that she is able to get herself up in the morning, bathe, wash her hair, comb her hair, brush her teeth, and dress herself unassisted. Regarding her ability to perform household chores, Mrs. Patton said that she is able to cook, make a sandwich, take out garbage, make the bed, wash clothes, wash dishes, sweep, and vacuum.

(DE 10, p. 405)  The plaintiff described her bad days as feeling "overwhelmed, dizzy, and tired," which usually occurred about once or twice a week.  (DE 10, p. 405)  She also told Hawkins and Hand that she enjoyed walking, that she visited her relatives about once a week, and that she shopped for groceries.  (DE 10, p. 405)

Hawkins and Hand described the plaintiff as polite, friendly, and cooperative, that they did not observe any symptoms of depression, and that the plaintiff "laughed and joked at times."  (DE 10, p. 405)  Hawkins and Hand further described the plaintiff as calm, with no observed symptoms of anxiety, that she did not appear to have any difficulty understanding test directions, that her concentration was adequate, that she was focused when responding to questions, and that she appeared to be answering honestly when asked questions.  (DE 10, pp. 405-06)  As far as the Mental Status Examination itself, Hawkins and Hand reported that the plaintiff was oriented to person, place

and circumstances, that her abstract reasoning was variable, that her concentration was adequate, but that she appeared to function at the "low average range of intelligence." (DE 10, p. 406) The plaintiff's visual motor skills were within normal limits, and her organizational skills were adequate. (DE 10, p. 406) Hawkins and Hand also noted that the plaintiff "did not report having any symptoms of Bipolar Disorder nor did she exhibit any symptoms of depression," and that her "adaptive functioning appear[ed] to be within limits." (DE 10, p. 407) As for their functional assessment, Hawkins and Hand reported that the plaintiff had no limitations based on her ability to understand, that she had no problems with her memory, that she had no limitations on her ability to concentrate, that she had no limitation with respect to her social skills, and that she had no limitation with respect to her knowledge of adaptive functioning. (DE 10, p. 407)

The plaintiff went to the Nashville General Hospital ("Meharry") emergency room (ER) on June 24, 2009 complaining of abdominal pain. (DE 10, pp. 482-96) She was instructed to return the following day, which she did. (DE 10, pp. 462-81) The plaintiff subsequently was admitted to St. Thomas where she underwent surgery on July 31, 2009 to remove gallstones. (DE 10, pp. 441-48) Although the surgery itself is not relevant to the action before the court, the following clinical observations made in the Meharry ER noted below are.

On her June 24th visit, the plaintiff was alert, oriented to person, time, and place; she was fully verbal as age appropriate; her speech was clear and she followed commands (DE 10, p. 485); she moved in all extremities; her bilateral breathing was clear, her respirations were regular and unlabored, and she denied trouble breathing; her mood and affect were normal, and no emotional or cognitive needs were noted. (DE 10, pp. 484-85, 487) The plaintiff was discharged that same day, and told to return to the Meharry ER the next day.

The following observations were made in the Meharry ER on June 25th: the plaintiff's ambulatory status was normal; she was alert, oriented, and fully verbal as age appropriate; her

speech was clear and she followed commands; she moved all extremities; her bilateral breathing was clear; her respirations were regular and unlabored; no emotional or cognitive needs were noted with respect to her bipolar disorder; she had adequate strength and full range of motion; her psychiatric evaluation was normal; she had normal interpersonal interactions with appropriate affect and demeanor; and she was characterized as an "[e]ducated patient" with "[n]o identified learning barriers." (DE 10, pp. 463-69)

On July 10, 2009, Dr. Thomas Neilson, Psy.D. performed a DDS Medical Consultant Analysis of the plaintiff.[9] (De 10, pp 421-38) Doctor Neilson noted that the plaintiff had a medically documented impairment of bipolar disorder in partial remission, and that the plaintiff's complaint was credible. Dr. Neilson nevertheless concluded that the plaintiff's limitations due to her bipolar disorder were "mild" and, as such, her impairment was non-severe. (DE 10, pp. 424, 435-36)

The plaintiff was treated at the Lloyd C. Elam Mental Health Center ("Elam") thirteen (13) times from August 13, 2009 to November 5, 2010. (DE 10, pp. 518-26) The plaintiff went to Elam initially on August 13, 2009 to have the prescription for her medication refilled. (DE 10, p. 522) During that visit, the physician, whose signature is illegible, diagnosed the plaintiff as having a bipolar II disorder,[10,11] noting additionally that the plaintiff told him that: she had been stable on Trileptal "for many years"; her last manic episode was "years ago"; she had been a "little depressed"

---

[9] The record shows that Dr. Glenda D. Knox-Carter, M.D. performed a DDS Medical Consultant Analysis of the plaintiff's physical complaints on July 7, 2009. (DE 10, pp. 410-13) Doctor Knox-Carter assessed the plaintiff's high blood pressure claim and sinus problems, concluding that neither, singly or combined, rose to the level of a severe impairment, and that the plaintiff's physical claims were not totally credible. (DE 10, pp. 410, 413)

[10] Bipolar II disorder is less severe than Bipolar I. *See* http://www.mayoclinic.com/health/bipolar-disorder/ DS00356/DSECTION=symptoms. Bipolar I may "cause significant difficulty in [one's] job . . . or relationships . . . [and] . . . [m]anic episodes can be severe and dangerous." *Id*. Bipolar II may cause "elevated mood, irritability and some changes in . . . functioning, but generally [one] can carry on with [one's] daily routine." *Id*.

[11] The less severe bipolar II diagnosis is consistent throughout the Elam treatment records.

since her husband had been in a motor vehicle accident and since she found out that a friend was being abused by her husband; and that she had "good" energy and concentration. (DE 10, p. 522) The plaintiff's GAF score is listed as 60 in those initial notes (DE 10, p. 526), revised upward to 60-65 on February 17, 2010 (DE 10, pp. 516-17), and revised further upward to 65-70 on June 3, 2010 (DE 10, pp. 511, 513-15).

On September 23, 2009, Dr. Brad Williams, M.D. filed a report with the SSA in which he wrote the following: "I have reviewed all the evidence in [the] file, and the mental assessment of 07/10/09 is affirmed as written." (DE 10, p. 460) The assessment to which Dr. Williams appears to refer is Dr. Neilson's July 10, 2009 DDS Medical Consultant Analysis in which Dr. Neilson determined that any mental impairment due to the plaintiff's bipolar disorder was non-severe and, therefore, not disabling. (DE 10, pp. 421-38)

Doctor Carolyn M. Parrish, M.D. performed a DDS Medical Consultant Analysis on the plaintiff on October 15, 2009. (DE 10 pp. 497-500). Doctor Parrish noted that the plaintiff's impairment was "severe now but will improve to non-severe within 12 months." (DE 10, p. 497) The plaintiff's condition at the time that resulted in Dr. Parrish's "severe now" notation pertained solely to the plaintiff's earlier gallstone surgery. (DE 10, p. 500)

On December 17, 2010, Drs. Shahid Ali, M.D. and Shagufta Jabeen, M.D. at Elam completed a Medical Source Statement. (DE 10, pp. 527-29) In that statement Drs. Ali and Jabeen wrote: the plaintiff's impairment affects her ability to understand, remember, and carry out instructions; the plaintiff has "mild" restrictions in her ability to understand and remember simple instructions, carry our simple instructions, and ability to make judgments on simple work-related decisions; the plaintiff has "moderate" restrictions in her ability to understand and remember complex instructions; and the plaintiff has "marked" restrictions in her ability to carry out complex instructions and ability to make judgments on complex work-related decisions. (DE 10, p. 527) With respect to the

foregoing, Drs. Ali and Jabeen also noted:

> Pt has diagnostic criteria met for Bipolar II D/O . . . which affects that ability of pt to focus, concentrate & pay attention to her daily chores & assignments. She is very anxious around people & it is really hard for her to make judgment[s] on a daily basis. She has low level of energy, no motivation & unrefreshed sleep, which can be a problem for daily functioning.

(DE 10, p. 527)

Doctors Ali and Jabeen also opined that her ability to interact with supervisors, co-workers, and the public, as well as responding to changes in the routine work setting were affected by her impairment. (DE 10, p. 528) Doctors Ali Jabeen noted the following further related restrictions: "mild" restriction in interacting appropriately with the public; "moderate" restriction in interacting appropriately with supervisors and co-workers; and "marked" restriction in responding appropriately to usual work situations and to changes in routine and work setting. (DE 10, p. 528) Doctors Ali and Jabeen made the following comments with respect to the foregoing:

> Pt gets panicked easily if explained about change, has depressed mood inspite of pharmaco and psycho therapy . . . mood swings have been affecting [her ability] to deal with any change in the environment or any Psychosocial stressors . . . gets easily short of breath while talking about her stressors, anxious, sweating. Gets easily irritable & stressed.

(DE 10, p. 528) Doctors Ali and Jabeen specified that the limitations they observed were first established on August 13, 2009, the first time she went to Elam. (DE 10, p. 528)

### B. Non-medical Documentary Evidence

The plaintiff provided the following relevant in formation – not previously addressed – in an eight-page function report June 2, 2009, forty-one (41) days after she filed her applications for

DIB and SSI benefits.[12]  (DE 10, pp. 161-68)  The plaintiff's daily routine included feeding her baby, cleaning house, watching television, making lunch, "sometimes" going to the neighbors to get their mail, making supper, feeding and bathing her pets with her husband's help and, on the weekend, going out to "various places, and to church on Sunday.  (DE 10, pp. 161-62)  The plaintiff further indicated that she needed no help with personal grooming matters or taking her medicine.  (DE 10, p. 163)  As far as chores around the house, the plaintiff stated that, in addition to cleaning house, her daily chores included mopping and sweeping, she cleaned trash in the yard and took the trash to the road.  (DE 10, p. 163)

In the report, the plaintiff also asserted that she went outside a "couple of times" every day, that she shopped once a week for clothes, groceries, and household items, and that she was able to pay her bills and count change.  (DE 10, p. 164)  As far as hobbies, the plaintiff listed "writing, swimming, walking, [and] cleaning," noted that she engaged in these activities "every couple days" except swimming and writing.  (DE 10, p. 165)  She also wrote that she went to the neighbors almost nightly, and with her family to the park, movies, church two to three times a week.  (DE 10, p. 165)

In addition to the foregoing, the function report shows that the plaintiff likes to be in social situations, although she preferred to be alone; that she could walk three (3) miles without having to stop or rest, but that it took her considerable time to recover; that she could pay attention for "hours"; that she was "good" at following instructions if she understood the instructions, or if she had to do what she was told to do; and that she was "good" at following spoken instructions.  (DE 10, p. 166)  In conclusion, the plaintiff wrote:

> I have applied for disability 2 or 3 times.  My breath has gotten

---

[12]  The plaintiff filed a second function report on October 6, 2009.  (DE 10, pp. 190-95) However, the second report, only six pages in length, is not as comprehensive as the first one.  Because the first function report is more comprehensive than the second, and because there are no meaningful differences between the second and the first, the first report is cited herein for the sake of completeness.

worse. I really need this to help pay bills, get my credit back to normal [*sic*] health depends my time with my family, I'm not able to work, because in years past I did not have these problems so, therefore, I need my disability, or I'm going to have to apply again. Please consider these request[s]. Thanks again.

(DE 10, p. 168)

In a work history report dated September 9, 2009, the plaintiff was the following questions, and provided the following answers:

1.  Q    How well do you get along with authority figures?

    A    Good, they are the ones who help you out.

    Q    How well do you handle stress?

    A    Good, my medicine makes me stable and I handle things as they come.

    Q    How well do you handle changes in routine?

    A    Good, I deal with changes. Thats [*sic*] life! So you go with the flow.

(DE 10, p. 188)

## C. Testimonial Evidence

### 1. Plaintiff's Testimony

The plaintiff testified that she was born on June 5, 1978, that she graduated from high school where she attended regular" classes as well as "special" classes in math and English, and that she completed "warehousing" training after graduating from high school. (DE 10, pp. 27-28) Although the plaintiff previously had a driver's license, she had given it up "because [her] parents talked [her] out of it. . . ." (DE 10, p. 28)

The plaintiff testified that she had last worked at Domino's Pizza ("Domino's") as an "insider" answering phones, "getting pizzas," and for approximately seven-plus years taking orders

and putting labels on boxes.  (DE 10, pp. 29, 37)  She left her job at Domino's on June 21, 2007, because she was going to have a baby.  (DE 10, pp. 29, 31)  The plaintiff worked in the fast food business before Domino's, although she had never been a cook.  (DE 10, p. 30)  She was of the opinion that she had been successful in her prior employment, that she had no problems making change, but that she had been fired once for allegedly stealing, which she denied.  (DE 10, p. 31)

The plaintiff left her job at Domino's in 2007 because she could no longer do the work due to her pregnancy.  (DE 10, p. 31)  According to the plaintiff she was not working at the time of the hearing because she had more health problems since having her baby, *i.e.*, high blood pressure, fatigue, and a swollen left ankle because of her weight.  (DE 10, pp. 31-32, 35)

The plaintiff testified that she had been treated at Centerstone for "a couple of years" for bipolar disorder and mental problems.  (DE 10, p. 32)  More recently, she had been treated at Elam for the same conditions.  (DE 10, p. 32)  With respect to her bipolar disorder, the plaintiff testified that it made her moody "some days," but that she "t[ook] medicine to fix that."  (DE 10, p. 32)  When asked whether her medication was "effective enough where [she] could work," the plaintiff replied, "Well, yes," but added that her fatigue and swollen ankle made it "hard for [her] to do the task at hand . . . ."  (DE 10, p. 33)

The plaintiff testified that she experienced fatigue two or three times a week, and had since having her baby in 2007.  (DE 10, p. 33)  The plaintiff took a daily iron pill for anemia that usually regulated her fatigue, but sometimes she became fatigued anyway.  (DE 10, p. 33)  As for her blood pressure problem, medication regulated that problem as well unless she forgot to take her medicine, in which case her blood pressure would go up.  (DE 10, p. 33)  As for her swollen left ankle, the plaintiff testified that the problem had surfaced " couple of months ago," and that the doctors "told

[her] to exercise . . . ." (DE 10, p. 34) According to the plaintiff, her ankle would begin to swell if she stood for more than an hour, that she usually had to elevate her feet at least three (3) times during an average day, and that depending on how much time she spent on her feet, she had to elevate her feet about thirty (30) minutes before the swelling went down. (DE 10, pp. 34-35) When asked what problems she was having that kept her from working at the time of the hearing, the plaintiff replied: high blood pressure, fatigue, and the swelling in her ankle. (DE 10, p. 34)

When asked the plaintiff how much weight she could lift, the plaintiff replied that she was able to lift a laundry basket, and her baby, which she estimated to weigh "20 something pounds." (DE 10, p. 36) The plaintiff estimated that she could stand approximately three (3) hours "off and on" in an 8-hour day, that she could probably sit five (5) to six (6) hours a day and that, on a typical day, she could walk "halfway across Centennial Park." (DE 10, pp. 36-37)

On questioning by the ALJ, the plaintiff testified that her job at Domino's had been part time, and that her last full time employment was at Jack in the Box, where she worked for approximately six (6) months at the drive-through window, cashiering, and cleaning the front lobby. (DE 10, p. 37) Prior to that, she worked full time at Burger King for about three (3) months, where she prepared food and cleaned the front lobby. (DE 10, p. 38) Those were the only two full time positions that the plaintiff had held in the previous fifteen (15) years the rest being, in the ALJ's words, "a whole bunch of little jobs . . . that were part time and didn't last for so long." (DE 10, pp. 38-39) The plaintiff explained that those were the only positions available, that she worked as many hours as she could, and that she changed jobs for "[b]etter money." (DE 10, p. 39)

When the ALJ asked the plaintiff about her three and one-half (3½) year old son, the plaintiff testified that he was enrolled in a "pre-start school" because of learning difficulties, that the bus

picked him up at 7:20 a.m. and brought him home at 2:10 p.m., that he went to school Monday through Friday, and that he previously was enrolled in the Regional Intervention Program (RIP). (DE 10, pp. 40-41) When asked what she did while her son was in school, the plaintiff testified that she cleaned, sometimes went back to sleep, bathed, and "usually just stayed home [to] get things done . . . ." (DE 10, p. 41)

As far as giving up her driver's license, the plaintiff explained that she never had an accident or received a ticket, but quit driving because her parents "thought [she] couldn't do it so [she] just gave up." (DE 10, p. 41) She testified further that she never had a car of her own, that someone drove her to and from work, and that she was never alone when she had driven. (DE 10, p. 42)

On redirect by attorney Taylor, the plaintiff testified that she had experienced manic episodes, but "[n]ot very often." (DE 10, p. 43) The plaintiff also testified that she had emotional difficulties since she was thirteen (13) years of age, that she had previously experienced "depressive episodes" because she wished her life were better, and that she had stopped going to Centerstone within the "last year or . . . year before." (DE 10, p. 43)

### 2. Vocational Expert's Testimony

Doctor Kenneth Anchor, Ph.D., Executive Director for the Center for Disability Studies in Nashville, testified as the VE at the hearing. (DE 10, pp. 44-46, 119-21) The ALJ posed the following hypothetical to him:

> [C]onsider a hypothetical worker who was 32 years old, had a 12th grade education . . . no past relevant work . . . no exceptional limits but is not able to carry out complex or detailed instructions, not able to maintain attention or concentration for more than two hours without having a short break . . . [a]nd not able to have more than occasional interaction with others. Would you be able to identify any jobs that the hypothetical worker could perform?

(DE 10, pp. 44-45) The VE answered "Yes" to the foregoing hypothetical, and he provided the

following three specific examples: kitchen helper with more than 2,800 positions in the Tennessee; laundry worker with more than 1,300 positions in Tennessee; and packer, with over 2,000 jobs available. (DE 10, p. 45) The VE determined that the plaintiff would be unable to work in the fast food industry due to the limitations on her on interaction with others. (DE 10, p. 45)

Attorney Taylor then asked the VE to consider the following amended hypothetical:

> [C]onsider an individual the same age, same educational background as the claimant, assuming that she had special education in math and English, and assume that she has frequent difficulties performing daily routine activities as a result of depression. Assume further that she is seldom able to concentrate and has extensive difficulty completing simple tasks without assistance. That she has frequent difficulty in accepting and adjusting to changes. Would the three positions that you have named, kitchen helper, laundry worker and packer, be available to that person?

(DE 10, p. 46) The VE replied:

> If those were ongoing limitations day in, day out, week in, week out, I would seriously doubt those jobs could be performed by such an individual.

(DE 10, p. 46) Attorney Taylor concluded by asking the VE: "Would there be any positions that individual could perform?" (DE 10, p. 46) The VE replied, "As far as full time work I would not be aware of any that exist in critical mass." (DE 10, p. 46)

### III. ANALYSIS

#### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the findings of fact are supported by substantial evidence in the Record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c); *Key*, 109 F.3d at 273.

#### B. Administrative Proceedings Below

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.
>
> Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.

Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then he is deemed disabled.

Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform his past relevant work, in which case the claimant is not disabled.

Fifth, the ALJ determines whether, based on the claimant's RFC, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir.2007). The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) The burden then shifts to the SSA at step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

The SSA's burden at the fifth step can be met by relying on the medical-vocational guidelines, known the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics in the applicable grid rule. *See Wright v. Massanari*, 312 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.*, *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4

(S.S.A.)); *see also Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining the RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

## 2. Notice of Decision

In his January 7, 2011 Notice of Decision ("the ALJ's Decision"), the ALJ determined that the plaintiff was not disabled within the meaning of the Act and, as such, she was not entitled to DIB or SSI. (DE 10, pp. 6-10) The part of the ALJ's decision that is the subject of this action is his residual functional capacity (RFC) determination quoted below:

> The claimant has the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but she cannot carry out complex or detailed instructions, cannot maintain attention or concentration for more than two (2) hours at a time, and cannot have more than occasional interaction with others.

(DE 10, ¶ 4, pp. 12-15)

## IV. Claims of Error

### A. Whether the ALJ Erred in Concluding That the Plaintiff Had Only Mild to Moderate Limitations Based on Her GAF Scores

The plaintiff argues that the ALJ's decision was unduly influenced by her GAF scores. (DE 12, p. 7) The plaintiff argues further that: the Commissioner has declined to endorse the use of GAF scores in determining matters pertaining to Social Security and SSI benefits; there is no direct correlation between GAF scores and the severity requirements of the mental disorders listings; GAF scores do not necessarily indicate improved symptoms or mental functioning, the ALJ should have given greater weight to treatment notes, medical records, and the plaintiff's subjective complaints.

19

(DE 12, p. 8)

A GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009)(internal quotation marks and citation omitted). A GAF score is not dispositive in and of itself, rather it is significant only to the extent that it elucidates an individual's underlying mental issues. *Id*. at 284; *see also* 65 Fed.Reg. §§ 50746, 50764–65 (2000) ("The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings."). Although a GAF score "may be of considerable help to the ALJ in formulating the RFC . . . it is not essential to the FRC's accuracy." *Howard v. Commissioner of Social Sec*. 276 F.3d 235, 241. (6th Cir. 2002). In other words, a GAF score is not "raw medical data" and, as such, GAF scores cannot establish mental functioning unsupported by substantial evidence." *See Kennedy*, 247 Fed.Appx. at 766; *see also DeBord v. Commissioner of Social Security*, 211 Fed.Appx. 411 (6th Cir. 2006).[13]

The ALJ made the following references to the plaintiff's GAF scores in his analysis of the plaintiff's mental RFC:

> Throughout treatment with Centerstone the claimant's . . . GAF . . . [s]core was never lower than 68 and was normally 70. Additionally, Dr. Ali assigned GAF ratings between 60-70. The DSM-IV-TR[14] explains that these scores indicate mild symptoms with some difficulty in occupational functioning, but generally functioning pretty well.
>
> . . .
>
> These examiners essentially felt that the claimant had no severe mental impairment, as they gave no actual diagnosis and assigned a

---

[13] The plaintiff appears to disparage GAF scores, and their applicability in disability determinations. (DE 12, p. 8) There is nothing in the Rules, or in the case law, that supports the plaintiff's implied claim that the Commissioner eschews the use of GAF scores. The only limitation on their use is that GAF scores cannot be used in and of themselves to establish a specific mental RFC.

[14] "DSM-IV-TR" is the abbreviation for the *Diagnostic and Statistical Manual* to which reference is made, *supra* at p. 3, n. 3.

GAF score of 65.

(DE 10, p. 14)  As shown, *supra* at pp. 3-5, 8-9, the statements above correctly reflect the record. The question, therefore, is whether the record supports the plaintiff's claim that the ALJ was unduly influenced by the plaintiff's GAF scores.

As an initial point, the Magistrate Judge notes that he ALJ made the following written statement at the beginning of his RFC analysis:

> . . . I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. I have also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

(DE 10, p. 12)  A review of the record supports the ALJ's statement above.

The ALJ addressed the plaintiff's testimony in his RFC analysis as it pertained to her mental condition.  (DE 10, pp. 12-13)  In that analysis, the ALJ correctly noted that the plaintiff's "mental impairments are controlled by medication and that [she] would be able to work currently except for her physical problems."  (DE 10, p. 12)  The ALJ also correctly noted that the plaintiff testified that "she liked to be in social situations, but liked being alone most of all . . . ."  (DE 10, p. 13)  Although the ALJ did not make any further reference to the plaintiff's testimony regarding her mental health in his analysis, as previously established *supra* at p. 12, the plaintiff testified that she got along "[g]ood" with authority figures because "they [we]re the ones who help you out," that her medications enabled her to handle stress "good" because they made her "stable and [that she] handle[d] things as they come," and that she handled change "good . . . [and was] . . . able to deal with changes."  The plaintiff testified further that, although she was moody some days, her

21

medication took care of that, and that her medications were effective enough that she could work. Finally, the plaintiff testified that she was not working at the time of the hearing solely because of blood pressure problems, fatigue, a swollen left ankle, and her weight – she made no mention whatsoever to any limitations due to her mental condition.

The ALJ next considered the five-plus years of Centerstone treatment records which, as discussed *supra* at pp. 3-5, showed that the plaintiff's bipolar disorder had been in remission since 2003, and that her bipolar disorder had only a "mild" effect on her functioning in all of the four categories measured. The Centerstone treatment records are consistent across the five-plus years to which they pertain with two exceptions. First, as previously noted, *supra* at p. 4 n. 5, the August 8, 2005 CRG assessment made a one-time change from "mild" to "moderate" limitations on the plaintiff's ability to adapt to change. As previously discussed, however, that single change was not supported by anything in the Centerstone treatment records, and the six subsequent assessments restored the earlier "mild" restriction. The second exception was the May 19, 2009 CRG assessment, discussed *supra* at p. 5, in which all assessments were changed from "mild" to "moderate," and the CRG group was changed from a 3 to a 1. The ALJ properly disregarded this report for two very good reasons: first, nothing in the CRG assessment itself supported the conclusions set forth in it , *i.e.*, no reference was made to any medically acceptable clinical and laboratory diagnostic techniques that led to the opinions in the report; and second, as previously shown *supra* at pp. 3-5, there was nothing in the 5-year-plus record of treatment at Centerstone that would have warranted such a report. In other words, the May 19, 2009 CRG assessment was an aberration in the context of her treatment at Centerstone.

The ALJ next considered the Elam records, and gave Dr. Ali's opinions "considerably greater weight"/"very significant weight" because, "as a treating physician Dr. Ali [was] in the best

position to evaluate the claimant's abilities." (DE 10, p. 15)  The ALJ took exception, however, to

Dr. Ali's December 17, 2010 opinion for the reasons stated below:

> Dr. Ali indicated that the claimant has moderate to marked limitations regarding complex instructions and I find that the claimant cannot carry out complex or even detailed instructions.  Dr. Ali indicates moderate restriction in the claimant's ability to interact with supervisors or coworkers and I find that the claimant can have no more than occasional (not frequent and not constant) interaction with supervisors, co-workers or the public. I do not accept Dr. Ali's opinion that the claimant has a substantial loss of ability to respond to usual work situations or to changes in a work setting because that opinion is inconsistent with the claimant's mental health treatment records going all the way back to March 5, 2004 . . . .

(DE 10, p. 15)  The ALJ properly disregarded Dr. Ali's December 17, 2010 opinion.  There is no

reference to any clinical and laboratory diagnostic techniques, medically acceptable or otherwise,

in the report that supported it.  Moreover, as previously established *supra* at pp. 8-9, there also is

nothing in the Elam treatment records to support such a report.  In other words, Dr. Ali's December

17, 2010 was an aberration in the context of the plaintiff's treatment at Elam.

Finally, the ALJ considered the psychological evaluation conducted by Hawkins and Hand,

*supra* at pp. 5-7, as well as the reports of State agency mental health consultants, Thomas Neilson

and Brad Williams, *supra* at pp. 8-9, all of whom, as the ALJ correctly noted, had determined that

the plaintiff did not have a severe mental impairment.  (DE 10, pp. 14-15)

As reasoned above, and as established in the review of the medical records *supra* at pp. 2-11,

it is clear that the ALJ was not unduly influenced by the plaintiff's GAF scores.  He merely referred

to the scores as part of the body of evidence before him.  Even if the ALJ had relied on the GAF

scores excessively, any error would be harmless.  There is more than ample documentation in the

administrative record to support the ALJ's RFC analysis regarding the plaintiff's residual mental

RFC without reference to the GAF scores.  In other words, the ALJ's decision regarding her residual

mental RFC is supported by substantial evidence irrespective of the GAF scores.

For the reasons explained above, this claim is without merit.

### B. Whether the ALJ Erred in Not Giving Proper
### Weight to the Opinion of the
### Plaintiff's Treating Psychiatrists

The plaintiff argues that the ALJ erred in not giving proper weight to the treating sources

and, in doing so, he failed to comply with SSR 96-2, 20 CFR §§ 404.1527(d)(2), and 416.927(d)(2).

(DE 12, pp. 11-13)  The plaintiff makes specific reference to her lengthy treatment at Centerstone

and Elam.  More particularly, the plaintiff argues:

> In the decision the ALJ cherry picked the limitations, accepting some
> and rejecting others without any logical or reasonable explanation.
> No only did he reject portions of the opinions of Dr. Ali and Dr.
> Jabeen but also the opinion of the Plaintiff's treating professionals at
> Centerstone  Mental Health. The opinions of Drs. Jabeen and Ali are
> not only supported by the Elam Mental Health records but also by the
> vast records from Centerstone and in particular the last mental
> assessment made on May 19, 2009.

(DE 12, p. 10)

Under the standard commonly called the "treating physician rule," the ALJ is required to

give a treating source's opinion "controlling weight" if it "is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the] case record." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)(quoting 20 C.F.R.

§ 404.1527(d)(2)). If the ALJ declines to give a treating source's opinion "controlling weight," he

must then balance the following factors to determine what weight to give it: "the length of the

treatment relationship and the frequency of examination, the nature and extent of the treatment

relationship, supportabilty of the opinion, consistency of the opinion with the Record as a whole,

and specialization of the treating source." *Cole* 661 F.3d at 937 (quoting *Wilson*, 378 F.3d at

544)(citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ has the duty to "give good reasons in [the] notice of determination or decision for the weight . . . give[en] [a] treating source's opinion." *Cole* 661 F.3d at 937 (citing 20 C.F.R. § 404.1527(d)(2)). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting S.S.R. 96–2p, 1996 WL 374188 (July 2, 1996)).

As previously discussed, *supra* at pp. 20-24, the ALJ gave controlling weight to the plaintiff's Centerstone and Elam treatment records. Moreover, the ALJ's decision is entirely consistent with those records. As discussed, *supra* at p. 23, the ALJ also gave Dr. Ali''s opinion "considerably greater weight"/"very significant weight" because he was the plaintiff's treating physician at Elam. The only part of Dr. Ali's opinion that the ALJ discounted was the former's December 17, 2010 opinion discussed *supra* at p. 23. The ALJ provided a thorough explanation for taking exception to that opinion, an explanation that is fully supported by the record. For these reasons, this claim is without merit.

## V. CONCLUSION

Neither of the plaintiff's claims have any merit. The ALJ applied the proper legal standards in his decision, and his findings of fact, conclusions of law, and final determination are supported by substantial evidence in the record.

## VI. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the record (DE 12) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and

file  written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

  **ENTERED** this 18th day of March, 2013.


       /s/Joe B. Brown     
       Joe B. Brown
       Magistrate Judge